**GIRARD GIBBS LLP**
DANIEL C. GIRARD (SBN 114826)
DENA C. SHARP (SBN 245869)
601 California Street, 14th Floor
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dcg@girardgibbs.com
chc@girardgibbs.com

**LABATON SUCHAROW LLP**
GREGORY S. ASCIOLLA *(pro hac vice pending)*
JAY L. HIMES *(pro hac vice pending)*
ERIC J. BELFI *(pro hac vice pending)*
MATTHEW J. PEREZ *(pro hac vice pending)*
ROBIN A. VAN DER MEULEN *(pro hac vice pending)*
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
gasciolla@labaton.com
jhimes@labaton.com
ebelfi@labaton.com
mperez@labaton.com
rvandermeulen@labaton.com

*Counsel for Plaintiff and the Proposed Class*

*[Additional Counsel on Signature Page]*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IRON WORKERS DISTRICT COUNCIL OF NEW ENGLAND WELFARE FUND, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ENDO PHARMACEUTICALS, INC., TEIKOKU SEIYAKU CO., LTD., TEIKOKU PHARMA USA, INC., ACTAVIS, INC., WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC., ANDA, INC., ANDA PHARMACEUTICALS, INC., and VALMED PHARMACEUTICALS, INC.,<br><br>Defendants. | No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

**NATURE OF THE ACTION**

1.        Iron Workers District Council of New England Welfare Fund ("Plaintiff"), on behalf of itself and all those similarly situated, brings this class action for claims arising under state antitrust laws to recover damages and equitable relief for the substantial injuries it and others similarly situated have sustained against Defendants, identified in more detail below, arising from Defendants' anticompetitive agreement to restrain competition in the market for lidocaine topical patch 5% ("lidocaine patch 5%") in the United States.  Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters.

2.        This antitrust action arises from the unlawful exclusion of generic competition from the market for lidocaine patch 5% by Defendants Endo Pharmaceuticals, Inc. ("Endo"); Teikoku Pharma USA, Inc. and Teikoku Seiyaku Co., Ltd. (together, "Teikoku," and collectively with Endo, "Teikoku/Endo"); and Actavis, Inc., Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., Anda, Inc., Anda Pharmaceuticals, Inc., and Valmed Pharmaceuticals, Inc. (collectively, "Watson").  Teikoku/Endo marketed lidocaine patch 5% under the brand-name Lidoderm®.  Prior to the launch of an AB-rated generic equivalent, Lidoderm® was the only lidocaine patch 5% available in the U.S. market and the only topical patch approved by the U.S. Food and Drug Administration ("FDA") for the treatment of post-herpetic neuralgia.

3.        Since Lidoderm®'s approval in 1999, Teikoku/Endo has been able to charge monopoly prices and earn monopoly profits on Lidoderm®.  In 2012, Lidoderm® had annual U.S. sales of approximately $1.3 billion.  Because generic versions of brand drugs are typically much less expensive than their brand counterparts, and because purchasers typically switch rapidly from a brand drug to the generic equivalent once the generic equivalent becomes available, Teikoku/Endo's monopoly prices and profits would quickly come to an end once one or more lower-priced generic versions of the product entered the market.

4.        On or about November 13, 2009, Watson sought approval from the FDA to launch a generic equivalent of Lidoderm®, which threatened to end Teikoku/Endo's monopoly profits on the sale of Lidoderm® in the United States.  Watson was the first generic drug

manufacturer to file a substantially complete Abbreviated New Drug Application ("ANDA") seeking approval of a generic equivalent of Lidoderm®, thereby making it eligible to sell a generic version of Lidoderm® without competition from other ANDA filers for a period of 180 days. Shortly thereafter, Teikoku/Endo sued Watson, alleging that Watson infringed U.S. Patent No. 5,827,529 ("the '529 patent"). During that patent suit, Watson raised a series of defenses, including invalidity and inequitable conduct, that seriously threatened the validity and enforceability of the '529 patent.

5.     Seeking to preserve its monopoly over lidocaine patch 5%, Endo filed another patent infringement suit alleging infringement of U.S. Patent No. 5,741, 510 ("the '510 patent"), U.S. Patent No. 6,096,333 ("the '333 patent"), and U.S. Patent No. 6,096,334 ("the '334 patent"). These patents were similarly weak, and were unlikely to survive challenge by Watson.

6.     A determination that the '529 patent was invalid, unenforceable, or not infringed would not only enable Watson to start competing with its lower-priced generic lidocaine patch 5%, but would also open the flood gates to competition from other generic manufacturers after the expiration of Watson's 180-day exclusivity period. The existence of the '510, '333, and '334 patents did not pose a significant legal risk to Watson. Thus, upon a finding of invalidity, unenforceability, or non-infringement of the '529 patent, Watson would have attempted an at-risk launch of its lidocaine patch 5% when it received FDA final approval of its ANDA.

7.     As described in greater detail below, in order to avoid losing its patent protection and monopoly on the sale of lidocaine patch 5%, Teikoku/Endo entered into an agreement (the "Agreement") on May 28, 2012 with Watson to eliminate competition between them for a period of time whereby:  (a) Watson agreed to drop its challenge to the Lidoderm® patents and delay launching its generic version of Lidoderm® until September 15, 2013, in exchange for (b) Teikoku/Endo's agreement to (i) provide at least $96 million worth of free-of-cost Lidoderm® (and potentially up to $240 million worth of free Lidoderm® under certain conditions), and (ii) not launch a competing authorized generic product ("AG") during Watson's 180-day generic marketing exclusivity period.

CLASS ACTION COMPLAINT

8.    Teikoku/Endo's furnishing of potentially hundreds of millions of dollars in free-of-cost Lidoderm® is, from an economic perspective, virtually indistinguishable from Teikoku/Endo writing a check for the same amount.  The Agreement allowed Teikoku/Endo and Watson to unlawfully share monopoly profits generated on the sale of Lidoderm®.

9.    Teikoku/Endo's agreement to not launch a Lidoderm® AG to compete with Watson's generic equivalent during Watson's 180-day generic marketing exclusivity period provided additional valuable consideration to Watson.  Watson's right to 180 days of generic exclusivity did not bar Teikoku/Endo from launching a Lidoderm® AG during Watson's exclusivity period.  While Watson's 180-day exclusivity period gave it the highly lucrative ability to sell generic lidocaine patch 5% without competition from other generic manufacturers, Defendants recognized that this valuable opportunity could be significantly reduced if Teikoku/Endo chose to launch their own AG during the first 180 days—a common strategy in the pharmaceutical industry.  Thus, Watson obtained a second financial inducement to delay its launch of a generic lidocaine patch 5% in the form of Teikoku/Endo's illegal agreement to refrain from launching a competing AG until seven and one-half months after Watson's generic lidocaine patch 5% was on the market.

10.    The Federal Trade Commission ("FTC") and other government entities have recognized that the presence of an AG significantly benefits purchasers by both increasing purchaser choices and also creating price competition that reduces generic drug prices during the first 180 days.  By agreeing to not exercise its lawful right to launch an AG until seven and one-half months after Watson's launch, Teikoku/Endo was agreeing to restrain or limit their ability to compete with Watson during this period.  This would increase Watson's unit sales and pricing power to the detriment of purchasers of Lidoderm® and Watson's generic equivalent.

11.    Watson was poised to launch a generic lidocaine patch 5% immediately upon receiving final approval from the FDA.  Absent the anticompetitive multi-million dollar payoff Watson received from Teikoku/Endo, Watson could and would have launched its generic equivalent of Lidoderm® much earlier than September 2013 because:  (a) it received final approval from the FDA to do so on August 23, 2012; (b) it had the resources available to make

3

CLASS ACTION COMPLAINT

1   commercial quantities of this product; and (c) it would have launched (i) "at-risk" after

2   termination of the 30-month stay, (ii) after prevailing in the patent litigation, or (iii) pursuant to a

3   settlement agreement with Teikoku/Endo that provided for an earlier entry date due to the non-

4   existence of the payoffs describe here.  Furthermore, but for the Agreement, Teikoku/Endo

5   would have launched its own less expensive Lidoderm® AG that would have entered the market

6   prior to September 2013 and in direct competition with Watson's generic product.  In turn, once

7   Watson's 180-day exclusivity period expired, other generic manufacturers would have also

8   launched generic lidocaine patch 5%.

9        12.    These earlier generic launches would have resulted in purchasers of Lidoderm®

10  and its AB generic equivalent paying substantially less for these products than they actually paid.

11  Defendants have shared in the illegal profits reaped from this scheme.  Because generic versions

12  of brand drugs are typically much less expensive than their brand-name counterparts, and

13  because purchasers typically switch rapidly from a brand to a generic equivalent once the generic

14  equivalent becomes available, the wrongful suppression of generic competition, as occurred here,

15  results in enormous overcharge damages to all purchasers of the drug at issue.

16       13.    Defendants' Agreement has:  (a) delayed or precluded the launch of less

17  expensive generic equivalents of Lidoderm® in the United States; and (b) fixed, raised,

18  maintained or stabilized the price of lidocaine patch 5% above the levels that would have

19  otherwise existed if subject to competition.  Defendants' Agreement was intended to and did, in

20  fact:  (a) preclude entry into the market of less expensive generic versions of lidocaine patch 5%

21  in the United States; (b) fix, raise, maintain or stabilize the prices of lidocaine patch 5% at supra-

22  competitive levels; (c) permit Teikoku/Endo to monopolize the market for lidocaine patch 5% in

23  the United States; and (d) allocate 100% of the lidocaine patch 5% market in the United States to

24  Endo.

25                      **JURISDICTION AND VENUE**

26       14.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)

27  because this is a class action in which the aggregate amount in controversy exceeds $5,000,000

28

4

CLASS ACTION COMPLAINT

and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d).  One or more of the Defendants resided, transacted business, was found, or had agents in this District; a substantial portion of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

16.     The trade and interstate commerce relevant to this action is the market for lidocaine patch 5%.  Each Defendant, directly or through its affiliates or subsidiaries, participated in the market in a continuous and uninterrupted flow of interstate commerce.  The activities of Defendants and their co-conspirators, as described herein, were within the flow of, and had a substantial effect on, interstate commerce.

## THE PARTIES

17.     Plaintiff Iron Workers District Council of New England Welfare Fund is based in Dorchester, Massachusetts and provides health and welfare benefits to active and retired iron workers who work or worked in Massachusetts, Maine, New Hampshire, Rhode Island, and Vermont.  During the Class Period, Plaintiff purchased and/or paid for some or the entire purchase price for Lidoderm® and/or its generic equivalent.  Plaintiff paid and/or reimbursed more for Lidoderm® than it would have absent Defendants' anticompetitive conduct to delay generic entry and was injured as a result of such conduct.

18.     Defendant Endo Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business at 100 Endo Boulevard, Chadds Ford, Pennsylvania.  Endo is a specialty pharmaceutical company engaged in the research, development, sale and marketing of prescription pharmaceuticals used primarily to treat and manage pain.

19.     Defendant Teikoku Seiyaku Co., Ltd. is a Japanese corporation, with its principal place of business at 567 Sanbonmatsu Higashikagawa, Kagawa 769-2695, Japan.  Teikoku Seiyaku Co., Ltd. is a special pharmaceutical company that develops and makes enhanced

pharmaceutical products based on its transdermal drug delivery technologies.  Teikoku Seiyaku's drug delivery technologies include the technology used in Lidoderm®.

20.    Defendant Teikoku Pharma USA, Inc. is a California corporation, having a principal place of business at 1718 Ringwood Avenue, San Jose, California.  Teikoku Pharma USA is a wholly-owned subsidiary of Teikoku Seiyaku Co., Ltd.

21.    Defendant Actavis, Inc. is a Nevada corporation with its principal place of business at 400 Interplace Parkway, Parsippany, New Jersey.

22.    Defendant Watson Pharmaceuticals, Inc. is a Nevada corporation with its principal place of business at 400 Interplace Parkway, Parsippany, New Jersey.  Watson Pharmaceuticals, Inc. acquired Actavis Group on or about October 31, 2012.[1]  Effective on or about January 24, 2013, Watson Pharmaceuticals, Inc. changed its name to Actavis.[2]

23.    Defendant Watson Laboratories, Inc. is a Nevada corporation with its principal place of business at 311 Bonnie Circle, Corona, California.  Watson Laboratories, Inc. is a subsidiary of Watson Pharmaceuticals, Inc., which is now Actavis.

24.    Defendant Anda, Inc. is a Florida corporation with its principal place of business at 2915 Weston Road, Weston, Florida.  Anda, Inc. is a subsidiary of Watson Pharmaceuticals, Inc., which is now Actavis.

25.    Defendant Anda Pharmaceuticals, Inc. is a Florida corporation with its principal place of business at 6500 Adelaide Court, Groveport, Ohio.  Anda Pharmaceuticals, Inc. is a subsidiary of Watson Pharmaceuticals, Inc., which is now Actavis.

26.    Defendant Valmed Pharmaceuticals, Inc. is a New York corporation with its principal place of business at 300 Alt Blvd., Grand Island, New York.  Valmed Pharmaceuticals, Inc. is a subsidiary of Watson Pharmaceuticals, Inc., which is now Actavis.

---

[1] Press Release, Watson Completes Actavis Acquisition, http://www.reuters.com/article/2012/11/01/idUS11740+01-Nov-2012+HUG20121101

[2] Press Release, Watson Announces New Name – Actavis – for Global Operations, http://ir.actavis.com/phoenix.zhtml?c=65778&p=irol-newsArticle&ID=1752588

CLASS ACTION COMPLAINT

1    27.    The actions taken by Defendants as described in this Complaint are part of, and

2 were taken in furtherance of, the unlawful scheme alleged herein. These actions were

3 authorized, ordered, and/or performed by Defendants' various officers, agents, employees, or

4 other representatives while actively engaged in the management of Defendants' affairs (or the

5 affairs of Defendants' predecessors-in-interest) within the course and scope of their duties and

6 employment, and/or with the actual, apparent, and/or ostensible authority of Defendants.

7    **REGULATORY AND ECONOMIC BACKGROUND**

8    28.    Generic competition allows purchasers at all levels of the pharmaceutical chain of

9 distribution to purchase both brand drugs and their generic equivalents at reduced prices.

10 Generic competition to a single brand drug can provide potentially billions of dollars in savings

11 to consumers, pharmacies, and other drug purchasers, as well as to private health insurers or state

12 Medicaid programs, both of which reimburse the cost of drug purchases by covered individuals.

13    29.    The FDA sets the standards for the approval of generic drugs. Upon satisfaction

14 of FDA regulations governing, among other things, safety, efficacy, and labeling, the FDA

15 confers upon a generic drug an "AB" rating. The AB rating signifies that the generic version is,

16 for all intents and purposes, bioequivalent[3] to its brand counterpart.

17    30.    The AB rating permits the generic drug to be substituted for the brand drug at a

18 pharmacy counter. All States permit – and indeed, some States require – pharmacists to

19 substitute an AB-rated generic drug for the corresponding brand drug, unless the prescribing

20 healthcare provider has specifically stated that the brand drug is to be used.

21    31.    Many health insurers and other third-party payors have adopted policies to

22 encourage the substitution of AB-rated generic drugs for their brand name counterparts. For

23

24    [3] Bioequivalence is defined as

25        the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available at

26        the site of drug action when administered at the same molar

27        dose under similar conditions in an appropriately designed study.

28    21 C.F.R. § 320.1(e).

CLASS ACTION COMPLAINT

1   example, many third-party payors implement a tiering system that places certain drugs on

2   different benefit tiers. A drug that is placed on one tier may receive only partial reimbursement,

3   while a drug placed on another tier may receive full reimbursement. Typically, branded drugs

4   are usually placed on a different tier than their corresponding generic. Furthermore, branded

5   drugs with a generic equivalent are usually subject to smaller reimbursements or higher co-pays,

6   while generic drugs will be given total (or near total) reimbursement with limited or no co-pay.

7        32.    As a result of these policies, healthcare professionals are incentivized to prescribe

8   generics so that they can receive higher reimbursements. In addition, these policies also

9   incentivize end-users to request generic drugs because of the cost-savings they may receive with

10  respect to their co-pay.

11       33.    Because both healthcare professionals and end-users are economically

12  incentivized to prefer generic drugs, AB-rated generics are usually able to capture a substantial

13  portion of the market.

14       34.    The first AB-rated generic is typically priced at a discount to its brand

15  counterpart. As additional AB-rated generics obtain FDA approval to enter the market, the

16  resulting increase in competition causes prices of both the first generic and the brand counterpart

17  to drop dramatically.

18       35.    Empirical studies have shown that within a year of generic entry, generics will

19  have obtained about 90% of the market, *i.e.*, pharmacists fill 90 of every 100 prescriptions for the

20  compound with an AB-rated generic. Indeed, an FTC study found that in a "mature generic

21  market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."[4]

22  **A.    FDA New Drug Approval Process**

23       36.    The Federal Food, Drug and Cosmetic Act (the "FDCA") and its accompanying

24  regulations set the standards for the approval of any new drug compound that is to be marketed,

25  sold, or distributed in the United States. Drug manufacturers seeking to gain FDA approval for a

26

27       _____

28  [4] FTC Staff Study, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions, at 8 (Jan. 2010), available at http://emmanuelcombe.org/delay.pdf.

new drug must file a New Drug Application ("NDA"). Applicants filing an NDA are required to provide a host of information demonstrating the safety and efficacy of their drug, including, but not limited to: (1) information and studies regarding the chemistry of the drug substance, which includes information concerning how the drug is manufactured; (2) information and studies regarding nonclinical pharmacology and toxicology for the new drug; (3) information and studies regarding the human pharmacokinetics and bioavailability; and (4) information and data from clinical studies on human subjects.[5]

37.    Upon satisfying FDA regulations concerning efficacy, safety and labeling, the FDA will approve the NDA, permitting the applicant to market, sell, and distribute the approved drug to the U.S. public.

38.    In addition, upon receiving FDA approval, the brand manufacturer will list any patents it believes cover the approved drug in a publication called the "Approved Drug Products with Therapeutic Equivalence Evaluations," which is more commonly referred to as the "Orange Book."[6]

39.    However, there are limitations on the types of patents that can be listed. Only drug substance patents (active ingredient), drug product patents (formulation and composition), and method-of-use patents qualify for listing in the Orange Book.[7] Thus, for example, process patents covering a new drug are not eligible for listing in the Orange Book (however, they may be asserted in a future patent litigation against any allegedly infringing product).

40.    In listing patents in the Orange Book, the FDA acts in a ministerial capacity. It does not verify whether the patents listed in the Orange Book are properly listed, and instead relies on the accuracy and truthfulness of the NDA applicant.

41.    In addition to the protection conferred by patents covering the brand manufacturer's drug, NDA applicants are afforded addition statutory protections for a drug

---

[5] *See* 21 C.F.R. § 314.50(c)-(d).
[6] 21 U.S.C. § 355(j)(7)(A)(iii).
[7] 21 C.F.R. § 314.53(b).

9

CLASS ACTION COMPLAINT

1  containing a new active ingredient. NDAs for drugs containing a new active ingredient are given

2  up to five years of marketing exclusivity before any generic drug manufacturer may file an

3  application for the approval of a generic formulation.[8]

**B.     The Hatch-Waxman Amendments to the FDCA Encourage and Facilitate the Approval of Generic Drugs**

6      42.     In 1984, Congress amended the FDCA with the enactment of the Drug Price

7  Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984),

8  more commonly known as the "Hatch-Waxman Amendments."

9      43.     The Hatch-Waxman Amendments simplify the regulatory hurdles that generic

10  drug manufacturers have to clear prior to marketing and selling generic drugs. Instead of filing a

11  lengthy and highly costly NDA, the Hatch-Waxman Amendments allow generic drug

12  manufacturers to obtain FDA approval in an expedited fashion through the filing of an

13  Abbreviated New Drug Application ("ANDA").

14      44.     If an ANDA applicant shows that the generic drug is bioequivalent to the brand

15  drug, then the ANDA applicant may rely on scientific and other data compiled in the brand drug

16  NDA it references concerning, among other things, safety and efficacy.[9] The ability to rely on

17  the scientific data published in the referenced NDA obviates the need for duplicative and

18  expensive experimentation and clinical trials, which in some instances can result in out-of-pocket

19  costs of upwards of $130 million.[10] The FDA must approve an ANDA unless the information

20  submitted in the ANDA is insufficient to meet the requirements under the Hatch-Waxman

21  Amendments.[11] In sum, the streamlined approval process under the Hatch-Waxman

22  Amendments makes it easier for generic drug manufacturers to bring competing and cheaper

23  generic products to market.

---

[8] 21 U.S.C. § 355(j)(5)(F)(ii).

[9] 21 U.S.C. § 355(j)(2)(A).

[10] *See* C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 N.Y.U. L. Rev. 1553, 1564 n.36 (2006).

[11] 21 U.S.C. § 355(j)(4).

10

CLASS ACTION COMPLAINT

45. Although the Hatch-Waxman Amendments seek to facilitate generic competition, the brand manufacturer retains the right to enforce any patents associated with its brand drug. As part of its ANDA, the applicant must certify that the generic drug will not infringe any of the Orange Book patents because: (1) no patents exist on the brand drug; (2) the patents have expired; (3) the patents will expire by the time the generic product comes to market; or (4) the patents are invalid, unenforceable, or will not be infringed by the sale of the generic product.[12] When a generic drug manufacturer certifies that the patents covering the referenced brand drug are invalid, unenforceable, or will not be infringed, it known as a "Paragraph IV certification."

46. When a generic drug manufacturer files a Paragraph IV certification asserting that one or more patents listed in the Orange Book are invalid, unenforceable or will not be infringed, it must serve notice of its certification to both the brand manufacturer and the owner(s) of the patent.

47. The issuance of a Paragraph IV certification creates an "artificial act" of patent infringement, permitting the patent owner to file a patent infringement suit against the ANDA applicant making the Paragraph IV certification(s).[13]

48. If the brand manufacturer files a patent infringement suit against the ANDA applicant within 45 days of receiving the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of: (a) 30 months; or (b) a court ruling that the patent is invalid, unenforceable, or not infringed by the ANDA. [14] During the 30-month stay, the FDA may grant "tentative approval" of an ANDA if the FDA determines that the ANDA would otherwise qualify for final approval, but for the 30-month stay.

---

[12] 21 U.S.C. § 335(j)(2)(A)(vii)(I)-(IV).

[13] 35 U.S.C. § 271(e)(2)(A).

[14] 21 U.S.C. § 355(j)(5)(B)(iii). The 30-month stay is in some instances a misnomer because it can last more than three years. The 30 months is measured from the innovator's receipt of notice, provided that notice is received by the innovator no earlier than the point five years after the innovator's marketing approval. *Id.* Thus, if a generic drug manufacturer files a Paragraph IV certification during its first year of eligibility – *i.e.*, between the fourth and fifth year after the NDA's approval – then the 30-month stay will not begin until the start of the fifth year after the NDA's approval. 21 U.S.C. § 355(j)(5)(F)(ii). *See also* Hemphill, *supra* note 10, at 1566 n.50.

11

49.     Despite the threat of a patent infringement suit and a 30-month stay, the Hatch-Waxman Amendments create powerful incentives for generic drug manufacturers to file ANDAs.  Specifically, the Hatch-Waxman Amendments grant a 180-day period of market exclusivity to the first applicant (the "first-filer") to file a substantially complete ANDA containing a Paragraph IV certification.

50.     During the 180-day period of market exclusivity, the first-filer only competes against the brand manufacturer and potentially any AG marketed under the brand manufacturer's NDA; all other generic ANDA applicants must wait until either the expiration of the 180-day exclusivity period or a court order finding that each of the patents that are the subject of a Paragraph IV certification are invalid, unenforceable, or not infringed.

51.     Because all other ANDA generics are barred from the market during the first-filer's 180-day exclusivity period, the first-filing ANDA applicant is able to price its generic version at a price slightly below the brand drug's price.  This allows the first-filer to gain market share, while simultaneously taking advantage of the price umbrella created by the brand manufacturer's pricing.  In addition, this pricing strategy effectively allows the first-filer to share the monopoly profits that previously were held exclusively by the brand manufacturer.

52.     However, once the first-filer's 180-day exclusivity period expires, all other FDA-approved ANDA filers can begin to market their generic equivalents, driving down prices substantially and reducing the profitability of both the branded drug and the first-filer's generic.

**C.     Brand Manufacturers and First-Filers' Manipulate the Regulatory Structure to Delay the Emergence of Generic Competition**

53.     Because the Hatch-Waxman Amendments automatically stay the approval of an ANDA when a brand manufacturer files an infringement suit against an ANDA applicant, the brand manufacturers have an incentive to liberally (and sometimes wrongfully) list in the Orange Book all patents potentially covering the brand drug.  Upon a generic drug manufacturer's filing of an ANDA with a Paragraph IV certification, the brand manufacturer will then sue on one or more of those Orange Book patents to trigger the stay.

CLASS ACTION COMPLAINT

54.     Frequently, patent infringement suits arising from Paragraph IV certifications result in settlements.  In some of these settlements, the brand manufacturer will offer the generic drug manufacturer some form of consideration (*i.e.*, payment) in exchange for the generic drug manufacturer agreeing to delay entry of its generic product.  These settlements commonly are referred to as "pay-for-delay agreements."

55.      These pay-for-delay agreements have the practical effect of permitting the settling brand manufacturer to retain a significant portion of its monopoly profits, while only ceding a relatively small portion of those profits to the settling generic drug manufacturer in exchange for the generic drug manufacturer's agreement to delay market entry.

56.     The incentive to create these types of agreements is particularly acute between a brand manufacturer and the first-filing ANDA applicant.  In these agreements, the brand manufacturer seeks to delay generic entry and preserve its monopoly for as long as possible.  Typically, a generic drug manufacturer will want as early an entry date as possible, if only for the higher present value of earlier sales.

57.     However, unlike other generic drug manufacturers, a first-filing ANDA applicant has the potential benefit of 180 days of marketing exclusivity where it can reap substantial revenues as potentially one of two products in the relevant drug market.  A first-filing ANDA applicant's continued litigation against the brand manufacturer runs the risk that the court will find the patent(s) at issue valid, enforceable, and/or infringed by the first-filer's ANDA.  A finding of validity, enforceability, and/or infringement by a court would negate the first filer's Paragraph IV certification and disqualify that generic drug manufacturer from receiving the benefit of 180 days of marketing exclusivity.  Thus, the first-filer has an acute interest in settling the patent infringement lawsuit as a means of guaranteeing its 180-day exclusivity period, and, in turn, the economic bounty associated with it.

58.     With the promise of substantial revenue during its generic exclusivity secure, the first-filer can be made indifferent to any delayed launch sought by the brand manufacturer, so long as the brand name manufacturer sufficiently compensates the first-filer for the delay in launching its generic.

CLASS ACTION COMPLAINT

59.     Moreover, brand manufacturers are willing to over-compensate the first-filer for any delay in generic launch in exchange for the promise that the first-filer will not enter before a certain date.  This is because the value of monopoly profits is so great that the brand manufacturer is willing to pay more to ensure the first-filer's acquiescence to the later launch date.  The generic drug manufacturer's acquiescence to a later entry date, in turn, preserves a substantial portion of the brand manufacturer's monopoly profits in the period prior to the first-filer's agreed-to launch date.

60.     In essence, by settling with the brand manufacturer, the first-filer receives a double bonus in the form of:  (1) a substantial payment from the brand manufacturer to forgo early entry; and (2) the guaranteed retention of shared monopoly profits during the first-filer's 180-day exclusivity period.  Under such circumstances, the first-filing ANDA applicant has limited incentive to continue the patent litigation for purposes of securing a judgment of non-infringement, invalidity, or unenforceability – and thus, a potentially earlier entry date – because it still retains the economic bounty associated with its statutory 180-day exclusivity period.

61.     Such pay-for-delay agreements also create powerful disincentives for subsequent ANDA filers to continue defending their ANDAs in patent infringement litigations against the brand manufacturer.  Specifically, once it becomes apparent that the brand manufacturer and the first-filer have settled their patent litigation, subsequent ANDA filers usually will not pursue litigation aggressively, and, often times, settle as well.

62.     Subsequent ANDA filers are unlikely to continue litigating because obtaining a judgment that the patents subject to Paragraph IV certifications are invalid, unenforceable, or not infringed provides little pay-off to the subsequent ANDA filer.  For example, prior to the enactment of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "MMA"), Pub. L. No. 108-173, 117 Stat. 2066, a judgment of patent invalidity or unenforceability would not cause the first-filer to lose its 180-day exclusivity period; rather, the subsequent filer's success in litigation would only accelerate the start of the first-filer's exclusivity period.  The subsequent ANDA filer must still wait until after the first-filer's 180-day exclusivity period expires, and it is only at that point when other FDA-approved ANDA

14

1    applicants can enter the market as well. Thus, these pay-for-delay agreements effectively "park"

2    exclusivity and cause a bottleneck in the timing of full generic entry.

3          63.    More recent legislation has not alleviated the problems caused by pay-for-delay

4    agreements. The MMA attempts to make the incentives underlying pay-for-delay agreements

5    less attractive by enumerating a series of forfeiture events that, if triggered, will deprive a first-

6    filer of its 180-day exclusivity period.

7          64.    For instance, one of the key forfeiture events under the MMA is a "failure-to-

8    market" by the first-filer.[15] A first-filer ANDA applicant forfeits its 180-day exclusivity period

9    if it fails to market the drug by the later of:

10            a.    The earlier of:

11                  (i)    75 days after final approval or

12                  (ii)    30 months after ANDA submission; **or**

13            b.    The date that is 75 days after the date as of which, as to each of the patents

14              that qualified the first-filer for exclusivity (*i.e.*, the filing of a Paragraph IV certification),

15              at least one of the following has occurred:

16                  (i)    A final decision of invalidity or non-infringement;

17                  (ii)    A settlement order entering final judgment that includes a finding

18    that the patent is invalid or not infringed; or

19                  (iii)    The NDA holder delists the patents subject to the first-filer's

20    Paragraph IV certification from the Orange Book.

21          65.    While noble in purpose, scholars have found the MMA's "use it or lose it"

22    provision to be woefully inadequate in deterring anticompetitive agreements to delay generic

23    competition for two reasons. First, market acceleration clauses, which are standard components

24    of pay-for-delay agreements, allow the first-filer to accelerate its entry into the market ahead of

25    the later date agreed to with the brand manufacturer in its settlement should a subsequent generic

26    challenger prevail in the courts.

27

28       [15] 21 U.S.C. § 505(j)(5)(D)(i)(I).

CLASS ACTION COMPLAINT

66.     Second, brand manufacturers can avoid triggering a potential forfeiture event by only suing on some, but not all, of the patents subject to the first-filer's Paragraph IV certifications.  Because a subsequent filer needs to obtain a judgment of invalidity or non-infringement with respect to **all** patents that are the subject of a first-filer's Paragraph IV certification in order to trigger the forfeiture event, the brand manufacturer need only sue on a few of the patents to avoid that scenario.

67.     The lengthy and expensive nature of patent litigation makes it such that subsequent filing generic drug manufacturers will not have the stomach to pursue litigation to the end.  Indeed, by the time a generic drug manufacturer secures the judgments necessary, "the clock [will] simply run[] out on the subsequent generic filers fighting to open the market earlier than the date agreed to by the first filer in its 'parked' exclusivity settlement."[16]

**D.    No-AG Agreements**

68.     Pay-for-delay agreements can be augmented by the inclusion of terms in which the brand manufacturer agrees not to launch an AG to compete with the first-filer during its 180-day exclusivity period.

69.     Agreements not to compete with an AG can take many forms.  According to the FTC, one such form includes agreements whereby the brand manufacturer agrees to supply the first-filer with the AG.  The result of this arrangement is that there is no competition between an AG and the first-filer's product for a period of time.

70.     As a threshold matter, a first-filer's 180-day exclusivity period does not prevent a brand manufacturer from marketing its own AG during that period of generic exclusivity.  AGs are chemically identical to the branded drug and are marketed under the brand manufacturer's NDA.  An AG can be marketed either through a generic drug division of the brand manufacturer or through a third-party generic drug manufacturer.

---

[16] Letter from Michael A. Carrier and David A. Balto to Sen. Tom Harkin, at 3, Apr. 21, 2011, *available at* http://www.hpm.com/pdf/blog/LIPITOR%20-%20Balto-Carrier%20Ltr.pdf.

**CLASS ACTION COMPLAINT**

71.     Competition from an AG during the first-filer's 180-day exclusivity period substantially reduces the first-filer's profit margins and increases price competition that ultimately benefits consumers and other purchasers of the branded drug and the first-filer's generic equivalent.

72.     In a 2011 study titled, *Authorized Generic Drugs: Short-term Effects and Long-Term Impact* (the "FTC 2011 Report"), the FTC found that AGs capture a significant number of generic drug sales, reducing the first-filer's revenues by approximately 50% on average during the 180-day exclusivity period.

73.     Although first-filers make significantly less money when they are forced to compete with an AG during the first 180 days, consumers benefit from the lower prices caused by competition between the AG and the first-filer.

74.     In light of the very substantial negative effects on a first-filer's bottom-line that can be caused by the presence of an AG, a promise by a brand manufacturer to not launch an AG confers significant value to a first-filer.  The value conferred to a first-filer is tantamount to a payment for agreeing to delay generic entry and competition.

## FACTUAL ALLEGATIONS

**A.     Background on Lidoderm® and the Patents at Issue**

75.     On March 19, 1999, the FDA approved NDA No. 20-612 for Lidoderm®, an adhesive patch product that containing 5% lidocaine for the relief of pain associated with postherpetic neuralgia ("PHN").

76.     Approximately 500,000 cases of herpes zoster ("shingles") occur in the United States each year.  The most common complication of shingles is PHN.  This disorder is characterized by pain along the cutaneous nerve region of a previous shingles flare-up that persists for more than 30 days after the lesions have resolved.  Approximately 20% of patients with shingles will experience this complication.

17

CLASS ACTION COMPLAINT

77.     Teikoku is currently the owner of and entity responsible for the Lidoderm® Patch NDA.[17]  Endo has the exclusive right to market and distribute the Lidoderm® Patch in the United States and sells the product under the authority of Teikoku's NDA.

78.     Prior to the FDA's approval of Lidoderm®, the U.S. Patent and Trademark Office ("PTO") issued Patent No. 5,827,529 ("the '529 patent"), entitled "External Preparation for Application to the Skin Containing Lidocaine."  The prosecution of the '529 patent was particularly difficult and lasted six years.  During this six-year prosecution, the PTO rejected patent applications for the '529 patent on grounds of obviousness based on prior art.  Ultimately, the application for the '529 patent was granted on October 27, 1998.  The '529 patent expires October 27, 2015.

79.     Following the issuance of the '529 patent, Teikoku submitted information regarding the '529 patent to the FDA for listing in the Orange Book with respect to Lidoderm®. The FDA thereafter listed the '529 patent in the Orange Book.

80.     Between November 2009 and May 2011, Endo obtained exclusive licenses for three additional patents from LecTec Corporation ("LecTec"):  the '510 patent; the '333 patent; and the '334 patent.

81.     In October 2010, Endo granted Teikoku a sublicense under the '510 patent to manufacture and sell prescription pain medicines and treatments that contain 5% lidocaine, in a patch dosage form, including Lidoderm®.  Shortly thereafter, Teikoku submitted the '510 patent to the FDA for listing in the Orange Book with respect to Lidoderm®.

82.     The '510 patent, the '333 patent, and the '334 patent (collectively, "the Rolf Patents") are all part of a single patent family.  Each Rolf Patent expires on March 30, 2014.

83.     Endo acquired the '510 patent from LecTec as part of the settlement of a patent litigation in the Eastern District of Texas, *LecTec Corporation v. Chattem, Inc., et al.*, No. 08-00130 (E.D. Tex.) (the "LecTec Litigation").  In that litigation, LecTec accused Endo of

---

[17] The Lidoderm® NDA was filed by Hind Health Care, Inc. ("Hind").  Teikoku assumed from Hind full ownership of and responsibility for the Lidoderm® NDA, effective on June 1, 1999.

CLASS ACTION COMPLAINT

1     infringing the '510 patent, as well as U.S. Patent No. 5,536,263, through its marketing and sale

2     of Lidoderm®. As part of the settlement, Endo agreed to pay LecTec $23 million for the

3     exclusive license for the patents in dispute.[18]

4          84.     On May 9, 2011, Endo acquired the full rights and title to the '510 patent, '333

5     patent and '334 patent, and U.S. Patent No. 6,361,790, as part of a Patent Purchase Agreement

6     with LecTec.[19] Endo paid LecTec $2 million for all of LecTec's rights, titles, and interests

7     worldwide for these patents.

8          85.     Lidoderm® was a huge commercial success for Endo. Between 2004 and 2007,

9     Lidoderm®'s sales jumped from $615 million to $1.085 billion.[20] In the first quarter of 2008

10     alone, sales of Lidoderm® constituted 62% of Endo's sales.[21] By 2012, Endo reached annual

11     sales of over $1.3 billion for Lidoderm®, accounting for almost 31% of Endo's sales revenue

12     that year. Such was the success of Lidoderm® that Endo established a website,

13     www.lidoderm.com, that was dedicated exclusively to the marketing of Lidoderm® to the

14     public.

15          86.     As a result of its patents, Teikoku/Endo possessed the power to charge monopoly

16     prices on Lidoderm® without losing customers, and it used its market power repeatedly, raising

17     prices even in the face of flat costs, while simultaneously increasing its sales volume.

18    **B.     Watson's ANDA and Endo's Patent Infringement Suit on the '529 Patent**

19          87.     On or about November 13, 2009, Watson submitted ANDA No. 20-675 to the

20     FDA, seeking approval to market a generic equivalent of Lidoderm®.

21          88.     On or about January 14, 2010, Watson notified Teikoku/Endo that it had filed

22     ANDA No. 20-675. Watson's notice letter included a Paragraph IV certification certifying that:

23

---

24        [18] LecTec Corporation and Endo Pharmaceuticals Inc. Settle Patent Dispute,

25    http://www.reuters.com/article/2009/11/11/idUS220332+11-Nov-2009+BW20091111

26        [19] LecTec Corp., Form 8-K,
   http://www.sec.gov/Archives/edgar/data/805928/000095012311049924/c17154e8vk.htm

27        [20] Endo Pharmaceuticals Holdings,
   http://www.wikinvest.com/stock/Endo_Pharmaceuticals_Holdings_%28ENDP%29#_note-6

28        [21] *Id.*

**CLASS ACTION COMPLAINT**

1  (i) the commercial manufacture, use, and/or sale of its generic lidocaine patch 5% product would

2  not infringe any valid claim of the '529 patent; and (ii) the '529 patent was invalid.

3      89.    As the first-filer of an ANDA for a generic version of Lidoderm®, Watson was

4  entitled to market its generic version for 180 days free of competition from other ANDA-based

5  generics. However, as explained above, this generic exclusivity does not protect Watson from

6  competition from a less expensive AG version of Lidoderm® sold by Endo or a licensee.

7      90.    On February 19, 2010, Teikoku/Endo sued Watson in the United States District

8  Court for the District of Delaware, *Endo Pharmaceuticals Inc. et al. v. Watson Laboratories, Inc.*

9  *et al.,* No. 1:10-cv-00138 (D. Del. Feb. 19, 2010), alleging that Watson's ANDA infringed the

10  '529 patent. Teikoku/Endo's infringement suit triggered a 30-month stay that prohibited the

11  FDA from granting Watson final approval to launch a generic equivalent of Lidoderm® until the

12  earlier of: (1) a final judgment that the '529 patent was invalid, unenforceable, and/or not

13  infringed; or (2) July 14, 2012, when the stay expired on its own terms.

14      91.    Watson counterclaimed, seeking a declaratory judgment that: (1) the '529 patent

15  was invalid; (2) Watson's proposed generic product did not infringe the '529 patent; and (3) the

16  '529 patent was unenforceable for inequitable conduct before the PTO. Watson's invalidity and

17  inequitable conduct counterclaims were based on the fact that: (i) the claims in the '529 patent

18  were anticipated by and disclosed in the relevant prior art; and (ii) Endo allegedly failed to

19  disclose relevant prior art to the patent examiner during the prosecution of the '529 patent.

20      92.    Specifically, Watson alleged that Teikoku failed to disclose prior art in the form

21  of its *own* patent applications in Japan, Europe, and the United States claiming the same

22  hydrogel patch technology described in the '529 patent and also claiming a range of water by

23  weight percentage that falls within the claimed range of the '529 patent. The following Teikoku

24  patent applications (the "Teikoku Prior Art") were not disclosed to the PTO during the

25  prosecution of the '529 patent:

26      a.    Japanese Unexamined Patent Application Publication S63-51330, issued March 4,

27          1988, titled "Steroid-Containing External Adhesive Agent;"

28

CLASS ACTION COMPLAINT

b.  Japanese Unexamined Patent Application Publication S61-195936, issued March 4, 1988, titled "Deprodone Propionate-Containing External Adhesive Agent;"

c.  European Patent Application Publication No. 0280737, published on September 7, 1988, titled "Steroidal Drug-Containing Preparation for External Use;"

d.  Japanese Unexamined Patent Application Publication 63-104913, issued on May 10, 1988, titled "Adhesive Patch for External Use;"

e.  Japanese Unexamined Patent Application Publication 63-238017, issued on October 4, 1988, titled "Water-Based Adhesive Patch for External Use Containing Carteolol Hydrochloride;" and

f.  U.S. Patent Application No. 07/639,758, filed on January 11, 1991, which was a continuation of U.S. Patent Application No. 07/189,313, filed on April 20, 1988.[22]

93.  Each of the pieces of Teikoku Prior Art disclosed an invention consisting of (1) a water-soluble high molecular weight substance; (2) water; and (3) a water-retaining agent, all of which fall within the percentage ranges claimed by the '529 patent. Moreover, each Teikoku Prior Art discloses examples of the ingredients used in the adhesive gel base that are the same as those disclosed in the '529 patent. Lastly, each of the pieces of Teikoku Prior Art shares at least one inventor with '529 patent and shares the same applicant, prosecuting attorneys or assignee with the '529 patent. Thus, Teikoku was fully aware of the Teikoku Prior Art both at the time of the '529 patent's prosecution and at the time of its patent infringement suit against Watson.

94.  Moreover, Teikoku failed to disclose this prior art to the PTO in the six years of prosecuting the '529 patent despite its obligation to do so. Each of the pieces of Teikoku Prior Art disclosed significantly more information than the prior art the PTO used as the basis for rejecting Teikoku's applications for the '529 patent on grounds of obviousness.

95.  On June 27, 2011, Watson obtained a favorable claims construction ruling on the '529 patent (the "'529 patent Claims Construction Order"). The district court found that the

_____

[22] U.S. Patent Application No. 07/639,758 was granted and was issued as U.S. Patent No. 5,082,663 on January 21, 1992.

21

CLASS ACTION COMPLAINT

1  Markush groups[23] described in the '529 patent were to be limited in their scope in accordance

2  with Federal Circuit precedent.  Specifically, for the term "a water soluble high molecular weight

3  substance selected from the group consisting of gelatin, starch, agar, mannan, alginic acid,

4  polyacrylic acid, a salt of polyacrylic acid, dextrin, methylcellulose, methylcellulose sodium,

5  carboxymethylcellulose, carboxymethylcellulose sodium, polyvinyl alcohol, polyvinyl

6  pyrrolidone, copolymer of methyl vinyl ether and maleic anhydride, gum arabic, tragacanth,

7  karaya gum and locust bean gum," the district court limited it to mean "*one and only one* water-

8  soluble high molecular weight substance selected from the specified list."

9         96.    The district court similarly restricted the term "water-retaining agent selected

10  from the group consisting of ethylene glycol, diethylene glycol, glycerin, sorbitol, marital,

11  propylene glycol and 1,3-butylene glycol" to mean "*one and only one* water-retaining agent

12  selected from the specified list."

13        97.    The district court's restriction of these patent terms substantially increased the

14  likelihood that Watson's generic lidocaine patch 5% product would not infringe the '529 patent.

15  Furthermore, as alleged above, Watson was poised to present strong evidence that the '529

16  patent was invalid due to obviousness and/or anticipation by the Teikoku Prior Art and due to

17  inequitable conduct by failing to disclose that Prior Art to the PTO during the prosecution of the

18  '529 patent.

19        98.    With respect to the '529 patent, a bench trial was held between February 6-14,

20  2012, before Judge Gregory M. Sleet in the District of Delaware.

21        99.    Success by Watson in litigating the invalidity, unenforceability, or non-

22  infringement of the '529 patent would have enabled Watson to start competing with its lower-

23  priced generic lidocaine patch 5% product because the 30-month stay would have expired

24  immediately upon such a judgment.  As explained in further detail below, even though Endo

25  sued Watson on the Rolf Patents, these patents posed little risk to Watson's generic version of

26

27        [23] "A Markush group is a listing of specified alternatives of a group in a patent claim,
    typically expressed in the form:  a member selected from the group consisting of A, B, and C."
28  *Abbott Labs. v. Baxter Pharm. Prods.*, 334 F.3d 1274, 1280 (Fed. Cir. 2003).

CLASS ACTION COMPLAINT

1   Lidocaine®. As a result, Watson likely would have undertaken an at-risk launch of its generic

2   version upon a judgment of invalidity or non-infringement.

3   **C.    Endo's Patent Infringement Suit Against Watson on the Rolf Patents**

4         100.   Fearing potential generic competition and determined to protect its monopoly in

5   the lidocaine patch 5% market, Endo obtained additional patent protection for Lidoderm®. As

6   described above, between November 2009 and May 2011, Endo obtained exclusive licenses for

7   the Rolf Patents from LecTec.

8         101.   Although Endo obtained an exclusive license for the Rolf patents, it was not until

9   October 2010, and well after the filing of Watson's ANDA No. 20-675 that Endo granted

10   Teikoku a sublicense under the '510 patent to make and sell prescription pain medicines and

11   treatments that contain 5% lidocaine, in a patch dosage form, including Lidoderm®.

12         102.   Endo did not submit to the FDA information regarding the '333 patent or '334

13   patent for listing in the Orange Book with respect to Lidoderm®.

14         103.   Because Endo did not list the '510 patent in the Orange Book within the

15   timeframe prescribed by 21 C.F.R. § 314.94(a)(12)(vi), Watson was not required to file a

16   Paragraph IV certification in connection with the '510 patent, and Watson did not do so.

17         104.   Two days after the '529 patent Claims Construction Order, on June 29, 2011,

18   Endo filed a patent infringement lawsuit against Watson, *Endo Pharmaceuticals Inc. v. Watson*

19   *Laboratories, Inc. et al.*, No. 1:11-cv-00575 (D. Del. June 29, 2011), alleging infringement of the

20   Rolf Patents. Watson counterclaimed, seeking declaratory judgments that the Rolf patents were

21   invalid and/or unenforceable and that Watson's generic lidocaine patch 5% would not infringe

22   the Rolf Patents.

23         105.   Indeed, the LecTec Litigation revealed that the '510 patent was likely invalid on

24   grounds of obviousness and unenforceable due to inequitable conduct before the PTO, including

25   the failure to disclose relevant prior art during the prosecution of the '510 patent. Specifically,

26   LecTec failed to disclose to the PTO the following prior art (the "'510 patent Prior Art"):

27         a.    U.S. Patent No. 5,175,052, issued on December 29, 1992, titled "Adhesive Tape

28                Preparation of Clonidine;" and

23

CLASS ACTION COMPLAINT

b.      German Offenlegungsschrift (published unexamined German-language patent application) No. DE 38 23 070 A.

106.    When LecTec submitted the '510 patent for reexamination by the PTO in December 2000, LecTec finally submitted the '510 patent Prior Art in an initial disclosure statement to the PTO, but in doing so: (i) buried that material in a list of 58 other prior art references; (ii) failed to eliminate clearly irrelevant or marginally relevant information; and (iii) failed to highlight that '510 patent Prior Art's significance to the claims being reexamined. LecTec also failed to disclose a patent search report that LecTec's counsel ran in furtherance of LecTec's prosecution of a European patent application covering the claims of the '510 patent, which also disclosed the existence of the '510 patent Prior Art. Lastly, LecTec failed disclose that the European Patent Office found the '510 patent Prior Art was relevant and made certain claims found in the '510 patent unpatentable. Because the '510 patent was subject to LecTec's inequitable conduct before the PTO, the '510 patent's validity and enforceability was suspect and Endo knew it.

107.    The weakness of the Rolf Patents was not limited to the infirmities inherent in the '510 patent—the '333 and '334 patents were also of questionable strength and relevance to Lidoderm®. This is because LecTec never asserted these patents in the LecTec Litigation, nor did Endo seek to obtain licenses to them in connection with its settlement of the LecTec Litigation. It was only after it began its patent infringement litigation against Watson on the '529 patent that Endo sought to acquire an interest in those patents.

108.    Thus, Watson had strong defenses and counterclaims against the Rolf Patents and, absent a settlement, Watson was likely to prevail in the litigation on the Rolf Patents.[24]

109.    Because Watson had strong defenses with respect to the Rolf Patents, in the event it succeeded in obtaining a declaration of invalidity or non-infringement with respect to the '529

---

[24] Indeed, in a parallel litigation against Mylan Technologies, Inc., Mylan Pharmaceuticals Inc., and Mylan Inc. (together, "Mylan"), Endo entered a consent decree in which judgment was entered in favor of Mylan on Endo's allegation of infringement on the '510 patent. *Endo Pharma. Inc. v. Mylan Techs. Inc.,* No. 11-220 (GMS), Dkt. 59 (D. Del. Oct. 17. 2013).

24

1    patent, Watson likely would have made an at-risk launch while continuing its litigation on the

2    Rolf Patents.

3    **D.    Defendants' Illegal Market Allocation Scheme**

4           110.    On May 28, 2012, while a decision from the district court on the '529 patent was

5    still pending, Defendants entered into a settlement agreement ending the litigation concerning the

6    '529 patent and the Rolf Patents.

7           111.    Pursuant to the Agreement, Watson agreed drop its challenges to the '529 and

8    Rolf Patents and to refrain from launching a generic equivalent of Lidoderm® until September

9    15, 2013.  The Agreement specifically provides:

10              Subject to Section 2(d), Watson agrees, on behalf of itself and its
                Affiliates, that, prior to the Start Date, it and its Affiliates shall not
11              directly or indirectly market, offer to sell, sell, have sold, import,
                manufacture or have manufactured in the Territory any of
12              Watson's Generic Product.  Watson acknowledges and agrees that
                each of Endo and Teikoku would be irreparably harmed should
13              Watson breach this Section 2(e).[25]

14                                    *        *        *        *

15
                 "Start Date" means the earliest of: (i) September 15, 2013; (ii) the
16              date of Launch of any Generic Product other than Watson's
                Generic Product; or (iii) the last day before Watson would forfeit
17              its 180-day generic drug exclusivity with respect to Watson's
                Generic Product due to the operation of 21 U.S.C. 355(j)(5)(D)(ii)
18              as a result of a forfeiture event under 21 U.S.C.
                355(j)(5)(D)(i)(I).[26]
19

20           112.    In exchange for Watson's agreement to drop its challenge to Teikoku/Endo's

21   patents and delay the launch of its lower-priced generic equivalent, Endo agreed to share with

22   Watson the monopoly profits that Teikoku/Endo would reap from Lidoderm®'s extended market

23   exclusivity through a "Brand Product Supply" provision.  Section 3 of the Agreement reads in

24   pertinent part:

25

26

27      [25] Agreement at § 2(e).

28      [26] *Id*. at § 1(v).

**Endo/Teikoku shall provide, <u>at no cost</u>, to Watson's Wholesaler Affiliate Brand Product of value totaling <u>twelve million dollars ($12,000,000) per month</u>**, as measured at the time of each delivery by the then-prevailing Wholesale Acquisition Cost as defined in the Red Book or, if the Red Book is not available, any other comparable U.S. price listing ("WAC"), **on the first business day of each month beginning January 1, 2013 and ending August 1, 2013 <u>(for a total of eight (8) months</u>)** for Watson's Wholesaler Affiliate's disposal as provided in Section 3(e).[27]

\*       \*       \*       \*

**The Brand Product supplied by Endo/Teikoku to Watson's Wholesaler Affiliate under Sections 3(b) through (d) may be <u>resold</u> solely by Watson's Wholesaler Affiliate to Third Parties for use solely in the Territory on pricing and other terms determined by Watson's Wholesaler Affiliate in its <u>sole discretion</u>**, provided that neither Watson nor any of its Affiliates (including its Wholesaler Affiliate) shall sell, distribute or dispose of Branded Product in any manner that would constitute a Bundled Sale.  **Watson agrees that its Wholesaler Affiliate will honor all Endo price-related contracts as communicated to all Endo wholesalers from time to time in the ordinary course of business, provided that the price related contracts do not impose any requirements on Watson's Wholesaler Affiliate that would be inconsistent with requirements imposed upon other Lidoderm® wholesalers, and further provided that such price-related contracts shall not conflict with the terms of this Agreement**.  Watson shall comply with all Applicable Laws in connection with its resale of the Brand Product.[28]

113.   The parties expressly provide in the Agreement in Section 1(a) that "Affiliate" means an entity that "directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a given entity."  Anda, Inc., Anda Pharmaceuticals, Inc., and Valmed Pharmaceuticals, Inc. – all subsidiaries of Watson – were each designated as a "Watson Wholesaler Affiliate" under Section 1(z) of the Agreement.  These entities thus operated as a single entity for purposes of carrying out the terms and purposes of the anticompetitive Agreement.

---

[27] *Id.* at § 3(b) (emphasis added).
[28] *Id.* at § 3(e) (emphasis added).

CLASS ACTION COMPLAINT

114.     Watson's agreement to honor all Endo price-related contracts effectively prevented Watson from selling any of the branded product delivered pursuant to the Agreement at prices appreciably lower than the monopoly prices charged by Endo for the brand product.  In fact, Anda, Inc., Anda Pharmaceuticals, Inc., and Valmed Pharmaceuticals, Inc. maintained the supra-competitive prices for branded Lidoderm® throughout the term of the Agreement.

115.     The Agreement further provided that if Watson did not receive FDA final approval of its generic Lidoderm® product by January 1, 2014, Endo would make up to twelve additional monthly payments to Watson in the form of $6,666,667 in free-of-cost branded Lidoderm® (for a total of $80 million of free-of-cost Lidoderm®).  The monthly payments would terminate if Watson received FDA final approval or if a third party launched a generic product during that period.

116.     In addition, the Agreement provided that if Watson did not receive FDA final approval of its generic Lidoderm product by January 1, 2015, Teikoku/Endo would make up to nine additional monthly payments to Watson in the form of $7,111,111 in free-of-cost branded Lidoderm® (for a total of $64 million in free-of-cost Lidoderm®).  These monthly payments would terminate the month before the expiration of the '529 patent, or would terminate earlier if Watson received FDA final approval or if a third party launched a generic product during that period.

117.     The compensation to Watson under the Agreement in the form of at least $96 million dollars – with the possibility of receiving as much as $240 million dollars – of free-of-cost Lidoderm® far exceeded Teikoku/Endo's avoided litigation costs.

118.     In addition to the potentially $240 million of free-of-charge Lidoderm®, Teikoku/Endo also agreed not to launch an AG version of Lidoderm® (or to grant a license to anyone else to sell its AG) for a period of seven and one-half months after Watson entered the market.  The Agreement reads in pertinent part:

> License. Subject to the terms and conditions of this Agreement, Endo/Teikoku hereby grant to Watson a non-exclusive (other than pursuant to Section 2(b)), royalty-bearing, non-transferable (other than pursuant to Section 21) and non-sublicensable (other than pursuant to Section 2(c)) license to the Licensed Patents to make,

27

have made, import, use, sell, and offer for sale Watson's Generic product in the Territory solely during the License Term.[29]

*   *   *   *

AG Product. The license granted pursuant to Section 2(a) shall be partially exclusive for a period of time in that **Endo/Teikoku and their respective Affiliates shall not market or sell a Generic Product, or authorize or license a Third Party to market or sell and AG Product at any time before the earlier of (i) <u>seven and a half (7.5) months from the Start Date</u>, and (ii) the Launch of any Third Party Generic Product in the Territory.**[30]

119. A brand manufacturer's launch of an AG is extremely damaging to any first-filer, like Watson, because it results in lost market share (*i.e.*, fewer units sold), and reduced profits because price competition between the generic and AG forces down prices. In addition, there is a reduction in the first-filer's long-term "first mover advantage." As the FTC noted in a June 2009 interim report on AGs, "consumers benefit and the healthcare system saves money during the 180-day exclusivity period when an AG enters the market, due to the greater discounting that accompanies the added competition provided by the AG."[31]

120. Because many States have regulations that either require or strongly encourage pharmacists to automatically substitute prescriptions for a brand drug with an AB-rated generic version of the brand drug in most situations, even if an NDA holder lowers the price of its brand drug, state regulations will force generic substitution absent a contrary directive from a healthcare provider.

121. The result is that a generic drug's sales volume is generally unaffected by a reduction in the brand drug's price and the generic drug does not feel the competitive pressure to lower its prices in response to a drop in the brand drug's price (in contrast to the situation where a brand manufacturer launches an AG). Thus, while an NDA holder can try to compete against a

---

[29] *Id.* at § 2(a).

[30] *Id.* at § 2(b) (emphasis added).

[31] FTC, Authorized Generics: An Interim Report, at 16 (June 2009), *available at* http://www.ftc.gov/sites/default/files/documents/reports/authorized-generics-interim-report-federal-trade-commission/p062105authorizedgenericsreport.pdf .

CLASS ACTION COMPLAINT

generic drug through various means other than launching an AG, those competitive options are far weaker and do not provide nearly the consumer savings and benefits as the launch of a true AG, which has its own unique NDC number, generic trade dress, generic pricing, and is formally considered a "generic" product in managed care sectors.

122. Consequently, Teikoku/Endo's agreement to restrict its competitive responses was part of an illegal, anticompetitive agreement, in which Defendants agreed to restrict competition that would have undermined Watson's sales and/or constrained Watson's prices for up to seven and one-half months after the launch of Watson's generic Lidoderm. The result of this Agreement was the maintenance of supra-competitive, duopoly pricing during Watson's 180-day exclusivity period.

123. Indeed, according to the FTC 2011 Report, the FTC concluded that a generic drug manufacturer might agree to delay the sale of its generic product in exchange for a brand manufacturer's agreement (such as the one involved here) to not launch an AG:

> To prevent this loss of revenue, a generic may be willing to delay its entry in return for a brand's agreement not to launch an authorized generic – that is, a brand's agreement not to compete with the generic through an AG – during the generic's 180 days of marketing exclusivity.

> Such agreements can harm consumers in two ways:

> - First, generic entry, and the accompanying discounts, would not be available to consumers as soon as otherwise would be the case. Because generic drugs often are priced substantially below the price of brand-name drugs, overall prescription drug costs could be significantly higher with just a few additional months without generic competition in a large market.

> - Second, consumers would lose the benefit of additional price discounting resulting from AG competition during the 180-day marketing exclusivity . . . . This consumer harm arises because the brand has agreed not to compete against the ANDA-generic during the exclusivity period,

1            i.e., from the *absence* of competition between the
2            AG and the ANDA-generic.[32]

3  124.  In that same Report, the FTC found that "authorized generics have a substantial

4  effect on the revenues of competing, generic firms during the 180-day exclusivity period;

5  depending on how the models are specified, they estimate that the presence of authorized generic

6  competition reduces the first-filer generic's revenues by 40 to 52 percent, on average."[33]

7  125.  Under the terms of the Agreement, Watson agreed to return to Teikoku/Endo a

8  share of the increased profits that would result from Endo's agreement not to launch an AG

9  during Watson's exclusivity period.  This came in the form of a 25% royalty on Watson sales

10  during the period in which no other generic was on the market.

11  126.  However, the 25% royalty on profits during the exclusivity period was a mere

12  pittance when compared to the value conferred onto Watson in the form of nearly $100 million

13  in free-of-cost Lidoderm® and Teikoku/Endo's no-AG covenant.

14  127.  Teikoku/Endo's unexplained agreement to pay Watson $96 million (and up to

15  $240 million in the event that Watson failed to get FDA approval), combined with its

16  unexplained agreement to forgo its right to launch a competing AG during Watson's generic

17  exclusivity period:

18        a.  suggest that Teikoku/Endo had serious doubts about the Lidoderm®

19  patents' validity and/or enforceability against Watson;

20        b.  provide strong evidence that Teikoku/Endo sought to induce Watson to

21  abandon its challenge to Teikoku/Endo's patents in exchange for a share of Teikoku/Endo's

22  monopoly profits that would otherwise have been lost in the competitive market; and

---

25  [32] FTC, Authorized Generic Drugs: Short-Term Effects and Long-Term Impact, at 139
26  (Aug. 2011), *available at* http://www.ftc.gov/sites/default/files/documents/reports/authorized-
generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-
27  commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-
trade-commission.pdf.
28  [33] *Id.* at iii.

**CLASS ACTION COMPLAINT**

1        c.     suggest that the consideration's objective was to maintain supra-

2 competitive prices to be shared between Defendants, rather than face what might have been a

3 competitive market.

4       128.     Watson received final FDA approval to launch its generic Lidoderm product on

5 August 23, 2012. However, in accordance with the Agreement, Watson did not launch its less

6 expensive generic product at that time, nor did Teikoku/Endo launch its less expensive AG.

7 Rather, Teikoku/Endo continued to enjoy the monopoly profits derived from its market

8 exclusivity and, on January 1, 2013, began to deliver no-cost branded product to Watson, which

9 Watson could and did resell at the Lidoderm® monopoly price.

10      129.     When Watson finally launched its AB-rated generic product in September 2013,

11 Teikoku/Endo complied with the Agreement and did not launch or license another entity to

12 launch a competing AG. As of the date of filing of this Complaint, the Watson product remains

13 the only AB-rated generic equivalent to Lidoderm® available in the United States.

14      130.     But for Defendants' ongoing, illegal, anticompetitive conduct, a less expensive

15 generic equivalent of Lidoderm®, and a less expensive Lidoderm AG, would have been

16 available in the United States far earlier than September 2013.

17      131.     But for Defendants' ongoing, illegal, anticompetitive conduct, Plaintiff and other

18 members of the Class would have paid lower prices for Lidoderm® and its generic equivalent

19 long before September 2013. As a result, Defendants, by their conduct, have injured Plaintiff

20 and other members of the Class by causing them to pay hundreds of millions of dollars in

21 overcharges on their purchases of Lidoderm® and Watson's generic equivalent.

22      **ANTICOMPETITIVE EFFECT**

23      132.     The Agreement has enabled Defendants to: (a) preclude the entry of less

24 expensive generic versions of Lidoderm products in the United States; (b) fix, raise, maintain, or

25 stabilize the price of Lidoderm products (both brand and generic); and (c) allocate 100% of the

26 U.S. market for lidocaine patch 5% to Endo.

27      133.     Watson's ANDA was finally approved by the FDA on August 23, 2012. But for

28 the illegal Agreement between Defendants (which included financial inducements to delay the

launch of less expensive generic versions of Lidoderm®), Watson would have begun selling a less expensive AB-rated generic version of Lidoderm® shortly thereafter.  Such sales would have occurred via market entry by Watson through:  (a) an agreement between Teikoku/Endo and Watson that did not include illegal financial inducements to delay generic launch and thus would allow for market entry prior to September 2013; (b) a victory by Watson in the patent litigation; or (c) an "at-risk" launch by Watson upon termination of the 30-month stay but before termination of the patent litigation.  In addition, absent the Agreement, upon Watson's launch, Endo would have begun selling its own less expensive AG in direct competition with Watson's generic.

134.    An increasingly competitive market for lidocaine patch 5% would have emerged as additional generic manufacturers entered the market.

135.    Defendants' unlawful concerted action has delayed or prevented the sale of generic Lidoderm in the United States, and unlawfully enabled Defendants to sell lidocaine patch 5% products at artificially inflated, supra-competitive prices.  But for Defendants' illegal conduct, generic competition to Lidoderm® would have occurred already because one or more of the generic companies would have already entered with their generic version of Lidoderm®.

136.    The anticompetitive harm in the form of delayed AB-rated and AG entry and restricted generic competition after entry far outweighs the pro-competitive benefits, if any, of the Agreement.

## EFFECT ON INTERSTATE COMMERCE

137.    During the relevant time period, Lidoderm® was sold and shipped across state lines and sold to customers located outside its state of manufacture.

138.    During the relevant time period, in connection with the purchase and sale of Lidoderm®, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

139.    During the relevant time period, various devices were used to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and

interstate and foreign telephone commerce. The activities of Defendants, as charged in this Complaint, were within the flow of, and have substantially affected, interstate commerce.

## MARKET POWER AND RELEVANT MARKET

140.    At all relevant times, Teikoku/Endo had monopoly power in lidocaine patch 5% market because it had the power to maintain the price of Lidoderm® at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Lidoderm®.

141.    A small but significant, non-transitory price increase for Lidoderm® by Endo would not have caused a significant loss of sales.

142.    Lidoderm® does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than AB-rated generic versions of Lidoderm®.

143.    There are no reasonably interchangeable drug products that are available to prescribing physicians for the indications for which lidocaine patch 5% are prescribed. Teikoku/Endo needed to control only Lidoderm® and its AB-rated generic equivalents, and no other products, in order to maintain the price of Lidoderm® profitably at supra-competitive prices. Only the market entry of a competing, AB-rated generic version of Lidoderm® would render Teikoku/Endo unable to profitably maintain its current prices of Lidoderm® without losing substantial sales.

144.    Lidoderm® is unique and not reasonably interchangeable with other therapies for the treatment of PHN. Prior to the launch of AB-rated generic equivalents in September 2013, Lidoderm® was the only topical lidocaine patch 5% available in the U.S. market and the only topical patch approved by the FDA for the treatment of post-herpetic neuralgia.

145.    Teikoku/Endo also sold Lidoderm® at prices well in excess of marginal costs, and substantially in excess of the competitive price, and enjoyed high profit margins.

146.    Defendants have had, and exercised, the power to exclude and restrict competition to Lidoderm® and AB-rated bioequivalent generics.

147.    Without the power to exclude and restrict competition to lidocaine patch 5% (Lidoderm® and AB-rated bioequivalent generics), and the ability to sell its own branded

33

version of Lidoderm® at prices well in excess of marginal costs, it would not have been economically rational for Teikoku/Endo to provide Watson with the alleged substantial financial inducements for the purpose of delaying Watson's launch of its AB-rated generic lidocaine patch 5%.

148.    Teikoku/Endo, at all relevant times, enjoyed high barriers to entry with respect to competition to the above-defined relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

149.    To the extent that Plaintiff is legally required to prove monopoly power through circumstantial evidence by first defining a relevant product market, Plaintiff alleges that the relevant market is for lidocaine patch 5% (*i.e.*, Lidoderm® and its AB-rated generic equivalents). During the period relevant to this case, Teikoku/Endo have been able to profitably maintain the price of lidocaine patch 5% well above competitive levels.

150.    The relevant geographic market is the United States.  At all relevant times prior to Watson's launch of an AB-rated generic equivalent of Lidoderm® in September 2013, Teikoku/Endo's market share in the relevant market was 100%, implying a substantial amount of monopoly power.

## CLASS ACTION ALLEGATIONS

151.    Plaintiff brings this action on behalf of itself and, under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, as representative of a class defined as follows:

> All persons or entities in the United States who, at any time during the Class Period of August 23, 2012 until the effects of Defendants' conduct cease, purchased branded or an AB generic version of Lidoderm® from any named Defendant (the "Class"). For purposes of the Class definition, persons or entities "purchased" Lidoderm if they paid or reimbursed some or all of the purchase price.  Excluded from the Class are Defendants and their officers, directors, management and employees, predecessors, subsidiaries and affiliates, and all federal governmental entities.

152.    Members of the Class are so numerous that joinder is impracticable.  While the exact number of Class members is unknown to Plaintiff, the members of the Class are widely dispersed throughout the United States.

153. Plaintiff's claims are typical of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants – they have paid artificially inflated prices for lidocaine patch 5% and were deprived of the benefits of competition from less expensive generic versions of Lidoderm® as a result of Defendants' wrongful conduct.

154. Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

155. Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, particularly class action antitrust litigation in the pharmaceutical industry.

156. Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable questions are inherent in Defendants' wrongful conduct.

157. Questions of law and fact common to the Class include:

    a. whether the conduct alleged herein constitutes a violation of the antitrust laws;

    b. whether Defendants conspired to suppress generic competition in the market for lidocaine topical patches;

    c. whether Teikoku/Endo paid Watson consideration under the Agreement;

    d. whether the consideration Teikoku/Endo provided Watson was for a purpose other than prolonging Teikoku/Endo's monopoly in the market for lidocaine patch 5%;

    e. whether the Agreement unlawfully precluded generic competitors not subject to the Agreement from entering the market for lidocaine patch 5%;

    f. whether Defendants' conduct harmed competition in the market for lidocaine patch 5%;

    g. whether Teikoku/Endo possessed market or monopoly power in the market for lidocaine patch 5%;

h.      whether the activities of Defendants as alleged herein have substantially affected interstate commerce; and

i.      whether, and to what extent, Defendants' conduct caused antitrust injury to the business or property of purchasers and if so, the appropriate measure of damages.

158.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

159.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Contract, Combination, or Conspiracy in Restraint of Trade under State Law )**

160.    Plaintiff incorporates and realleges all paragraphs in this Complaint, as though fully set forth below.

161.    By engaging in the anticompetitive conduct alleged herein, Defendants have intentionally and unlawfully engaged in one or more contracts, combinations and/or conspiracies in restraint of trade in violation of the following state laws:

a.      Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Arizona by members of the Class.

b.      Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and §§ 17200, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in California by members of the Class.

c.      D.C. Code Ann.§§ 28-4501, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in the District of Columbia by members of the Class.

36

d.     Fla. Stat. §§ 501. 201, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Florida by members of the Class.

e.     Hawaii Code § 480, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Hawaii by members of the Class.

f.     Iowa Code § 553, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Iowa by members of the Class.

g.     Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Kansas by members of the Class.

h.     Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Massachusetts by members of the Class.

i.     Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Maine by members of the Class.

j.     Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Michigan by members of the Class.

k.     Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Minnesota by members of the Class.

l.     Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Mississippi by members of the Class.

m.     Neb. Rev. Stat. Ann. §§ 59-801, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Nebraska by members of the Class.

n.     Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Nevada by members of the Class.

o.     N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in New Mexico by members of the Class.

p.     N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in New York by members of the Class.

q.     N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in North Carolina by members of the Class.

CLASS ACTION COMPLAINT

r.    N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in North Dakota by members of the Class.

s.    10 L.P.R.A. § 258 with respect to purchases of Lidoderm and/or its AB generic equivalent in Puerto Rico by members of the Class.

t.    R. I. Gen. Laws §§ 6-36-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Rhode Island by members of the Class.

u.    S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in South Dakota by members of the Class.

v.    Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Tennessee by members of the Class.

w.    Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Utah by members of the Class.

x.    Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Vermont by members of the Class.

y.    W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in West Virginia by members of the Class.

z.    Wis. Stat. §§ 133.01, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Wisconsin by members of the Class.

162.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class Members were deprived of the opportunity to purchase a less expensive generic version of Lidoderm® earlier and were forced to pay higher prices. This injury is of the type the antitrust and consumer protection laws of the above states, the District of Columbia and the territories were designed to prevent and flows from that which makes Defendants' conduct unlawful.

### SECOND CLAIM FOR RELIEF
### (Monopolization under State Law)

163.    At all relevant times, Teikoku/Endo possessed monopoly power in the relevant market.

38

164. Teikoku/Endo entered into an illegal agreement with Watson as part of an overall scheme to settle a patent infringement suit in order to maintain its monopoly power in the market for lidocaine patch 5%.

165. The goal, purpose and effect of the illegal agreement was for Teikoku/Endo to maintain and extend its monopoly power in the lidocaine patch 5% market.

166. Plaintiff and members of the Class indirectly purchased substantial amounts of Lidoderm® from Endo.

167. As a result of Defendants' illegal conduct, Plaintiff and members of the Class were forced to pay, and did pay, more than they would have paid for Lidoderm® and/or its AB generic equivalent.

168. Had manufacturers of generic Lidoderm® entered the market and lawfully competed in a timely fashion, Plaintiff and members of the Class would have substituted lower-priced generic Lidoderm® for the higher priced branded version for some or all of their Lidoderm® requirements and/or would have paid lower net prices on their remaining Lidoderm® purchases.

169. By engaging in the foregoing misconduct, Teikoku/Endo has violated the following state antitrust laws:

a. Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Arizona by members of the Class.

b. Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and §§ 17200, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in California by members of the Class.

c. D.C. Code Ann.§§ 28-4501, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in the District of Columbia by members of the Class.

d. Fla. Stat. §§ 501. 201, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Florida by members of the Class.

e. Hawaii Code § 480, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Hawaii by members of the Class.

f. Iowa Code § 553, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Iowa by members of the Class.

g.   Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Kansas by members of the Class.

h.   Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Massachusetts by members of the Class.

i.   Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Maine by members of the Class.

j.   Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Michigan by members of the Class.

k.   Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Minnesota by members of the Class.

l.   Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Mississippi by members of the Class.

m.   Neb. Rev. Stat. Ann. §§ 59-801, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Nebraska by members of the Class.

n.   Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Nevada by members of the Class.

o.   N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in New Mexico by members of the Class.

p.   N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in New York by members of the Class.

q.   N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in North Carolina by members of the Class.

r.   N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in North Dakota by members of the Class.

s.   10 L.P.R.A. § 258 with respect to purchases of Lidoderm and/or its AB generic equivalent in Puerto Rico by members of the Class.

t.   R. I. Gen. Laws §§ 6-36-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Rhode Island by members of the Class.

40

CLASS ACTION COMPLAINT

u.     S.D. Codified Laws Ann. §§ 37-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in South Dakota by members of the Class.

v.     Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Tennessee by members of the Class.

w.     Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Utah by members of the Class.

x.     Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Vermont by members of the Class.

y.     W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in West Virginia by members of the Class.

z.     Wis. Stat. §§ 133.01, *et seq.*, with respect to purchases of Lidoderm and/or its AB generic equivalent in Wisconsin by members of the Class.

170.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class Members were deprived of the opportunity to purchase a less expensive generic version of Lidoderm® and were forced to pay higher prices. This injury is of the type the antitrust and consumer protection laws of the above States, the District of Columbia and the territories were designed to prevent and flows from that which makes Defendants' conduct unlawful.

**THIRD CLAIM FOR RELIEF**
**(Unjust Enrichment)**

171.     Plaintiff incorporates the preceding paragraphs by reference.

172.     To the extent required, this claim is pled in the alternative to the other claims in this Complaint.

173.     Defendants have benefited from the overcharges on sales of Lidoderm® made possible by the unlawful and inequitable acts alleged in this Complaint.

174.     Defendants' financial benefits are traceable to Plaintiff's and Class Members' overpayments for Lidoderm®.

CLASS ACTION COMPLAINT

175.    Plaintiff and Class Members have conferred an economic benefit upon the defendants in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and Class Members.

176.    It would be futile for Plaintiff and Class Members to seek a remedy from any party with whom they had or have privity of contract.  Defendants have paid no consideration to anyone for any of the benefits they received indirectly from Plaintiff and Class Members.

177.    It would be futile for Plaintiff and Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Lidoderm®, as those intermediaries are not liable and would not compensate Plaintiff and Class Members for Defendants' unlawful conduct.

178.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for Lidoderm® is a direct and proximate result of Defendants' unlawful practices.

179.    The financial benefits Defendants derived rightfully belong to Plaintiff and Class Members, who paid anticompetitive prices that inured to Defendants' benefit.

180.    It would be inequitable under unjust enrichment principles under the laws of each of the states in the United States and the District of Columbia and Puerto Rico for Defendants to retain any of the overcharges Plaintiff and Class Members paid for Lidoderm® that were derived from Defendants' unfair and unconscionable methods, acts, and trade practices.

181.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Class.

182.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiff and Class Members.

183.    A constructive trust should be imposed upon all unlawful or inequitable sums the Defendants received that are traceable to Plaintiff and Class Members.

184.    Plaintiff and Class Members have no adequate remedy at law.

42

**CLASS ACTION COMPLAINT**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed class, prays for judgment against all Defendants, jointly and severally, as follows:

A.      The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.      That the Court adjudge and decree that Defendants and each of them have violated the state laws set forth above;

C.      That Plaintiff and all others similarly situated are awarded damages suffered by reason of these violations and that those damages are trebled in accordance with applicable state law;

D.      That Plaintiff and all others similarly situated are awarded equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

E.      That Plaintiff be awarded reasonable attorney's fees and costs; and

F.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury, pursuant to Federal Rules of Civil Procedure 38(b).


DATED: May 29, 2014                    **GIRARD GIBBS LLP**

                                       /s/ Daniel C. Girard
                                       DANIEL C. GIRARD (SBN 114826)
                                       DENA C. SHARP (SBN 245869)
                                       601 California Street, 14th Floor
                                       San Francisco, CA 94108
                                       Tel: (415) 981-4800
                                       Fax: (415) 981-4846
                                       dcg@girardgibbs.com
                                       chc@girardgibbs.com

CLASS ACTION COMPLAINT

**LABATON SUCHAROW LLP**
GREGORY S. ASCIOLLA
JAY L. HIMES
ERIC J. BELFI
MATTHEW J. PEREZ
ROBIN A. VAN DER MEULEN
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
gasciolla@labaton.com
jhimes@labaton.com
ebelfi@labaton.com
mperez@labaton.com
rvandermeulen@labaton.com

*Counsel for Plaintiff and the Proposed Class*

**THORNTON NAUMES LLP**
MICHAEL P. THORNTON
GARRETT J. BRADLEY
100 Summer Street
Boston, MA 02110
Tel: (888) 491-9726
Fax: (617) 720-2445
mthornton@tenlaw.com
gbradley@tenlaw.com

*Additional Counsel for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT